**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Huda Ahmed, | No. CV-17-0573-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 16). Defendant filed her Brief ("Response") (Doc. 17), and Plaintiff filed her Reply Brief ("Reply") (Doc. 18). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

I.    **BACKGROUND**

   *A.    Procedural History*

On September 27, 2013, Plaintiff filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of September 27, 2013 due to insomnia, post-traumatic stress disorder ("PTSD"), depression, and high blood pressure.[1]    *See*

---

[1] Plaintiff amended her original onset date to the protective filing date of September 27, 2013 at the first administrative hearing. *See* AR at 38.

Administrative Record ("AR") at 21, 23, 38, 53, 64–65, 67–68, 72, 192, 222. The Social Security Administration ("SSA") denied this application on January 23, 2014.[2] *Id.* at 21, 64–70. On February 20, 2014, Plaintiff filed a request for reconsideration, and on July 11, 2014, SSA denied Plaintiff's application upon reconsideration. *Id.* at 21, 71–83. On July 24, 2014, Plaintiff filed her request for hearing. *Id.* at 21, 96–97. On January 14, 2016, an initial hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens. *Id.* at 21, 49–63. On May 26, 2016, a supplemental hearing was held before ALJ Havens. AR at 21, 35–48. On June 28, 2016, the ALJ issued an unfavorable decision. *Id.* at 18–29. On July 29, 2016, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on October 25, 2017, review was denied. *Id.* at 1–4, 189–91. On November 22, 2017, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B.   *Factual History*

Plaintiff was fifty-five (55) years old at the time of the initial administrative hearing, fifty-six (56) at the time of the supplemental hearing, and fifty-three (53) at the time of the alleged onset of her disability. AR at 54, 64–65, 67–68, 72–73, 149, 192, 218, 244, 264. Plaintiff obtained a high school diploma. *Id.* at 54, 64, 69, 80, 223. Prior to her alleged disability, Plaintiff worked in fast food, as a hotel housekeeper, and as a sales associate at Target. *Id.* at 199–200, 254.

### 1.   Plaintiff's Testimony

### a.   Administrative Hearing

### i.   *January 14, 2016*

At the administrative hearing, Plaintiff testified that she has a high school diploma, from her native country of Iraq. AR at 54. Plaintiff further testified that she is unable to read in English, but can do simple adding and subtracting. *Id.* at 54–55. Plaintiff testified that she had not worked since September 27, 2013. *Id.* at 55. Plaintiff confirmed that she suffers from hypertension, post-traumatic stress, anxiety, and

---

[2] The Administrative Law Judge's opinion states the initial denial took place on January 27, 2014; however, the Disability Determination documents are dated January 23, 2014.

depression. *Id.*

Plaintiff testified that she lives in government housing with her son and daughter. *Id.* Plaintiff testified that she wakes up around ten (10) o'clock in the morning, because she normally goes to sleep late. AR at 56. Plaintiff further testified that her twenty-three (23) year old daughter always helps her dress and bathe, as Plaintiff is unable to do so without help. *Id.* Plaintiff also testified that her son is receiving SSI, and that is how the family is supported. *Id.* Plaintiff testified that she does not do any household chores because she cannot stand for long periods, and as such, her daughter does the chores. *Id.* at 56–57. Plaintiff further testified that she tries to sleep during the day, because she cannot sleep at night. *Id.* at 57. Plaintiff also testified that sometimes she goes out with her son to do the shopping or watches television, but does not otherwise go outside of her home and never goes out without her son. AR at 57–58, 61–62. Plaintiff testified that she does not have a driver's license and relies on her son to take her to the doctor and to give her medication. *Id.* at 57.

Plaintiff further testified that she starts remembering what happened to her in Iraq and begins screaming. *Id.* at 58. Plaintiff testified that she sees a Dr. Davis, as well as a psychiatrist. *Id.* Plaintiff also testified that she has side effects from her medications including dizziness from her blood pressure medicine, as well as her mental health medications. *Id.* at 58–60. Plaintiff testified that she sees her doctor for her physical problems every month and goes to COPE for mental health services twice a month. AR at 59. Plaintiff testified that she could stand for approximately fifteen (15) minutes and walk no more than ten (10) meters. *Id.* at 59–60. Plaintiff further testified that she could sit for approximately one-half hour and could lift not more than ten kilograms. *Id.* at 60. Plaintiff attributed these symptoms to her kidney problems. *Id.* Plaintiff testified that when she was working she would be late to work often because she could not sleep at night due to her mental health issues. *Id.* Plaintiff further testified that she would have panic attacks remembering events from her past and be unable to work. AR at 60. Plaintiff stated that employers found her unreliable and would fire her. *Id.*

Plaintiff also testified that she has a thyroid mass that may require surgery. *Id.* at 61. Plaintiff testified that she had kidney stones, some of which were removed in July 2015, but that an additional surgery was necessary to remove the remaining stones. *Id.* Plaintiff further testified that her sinus tachycardia causes chest pains and difficulty breathing. *Id.*

### ii. May 26, 2016

Plaintiff testified that her condition had not improved since the previous hearing. AR at 38–39. Plaintiff further testified regarding the loss of her husband during the Iraq/Iran war and her son being shot in his leg and diagnosed with a tumor. *Id.* at 41–42. Plaintiff also testified that she had been a teacher in Iraq, but had to leave once her son was injured and sick. *Id.* at 42. Plaintiff testified that as a result of her experiences in Iraq, she now suffers from panic attacks. *Id.* at 43. Plaintiff further testified that she is also homesick. *Id.* Plaintiff also testified that she needs surgery for her kidneys, and that her kidneys cause her to be unable to stand. AR at 43. Plaintiff reported that she because of her kidney stones, she is unable to undergo surgery for her thyroid. *Id.* at 43–44. Plaintiff indicated that her back and shoulder pain were also due to the kidney stones. *Id.* at 45. Plaintiff confirmed that she can only stand for approximately a half hour, can sit for approximately one (1) hour before needing to change positions, and can lift less the ten (10) kilograms. *Id.* at 46. Plaintiff testified that she has feeling of desperation and has difficulty with focus and concentration, requiring her son to remind her to take her medication. *Id.*

### b. Administrative Forms

Plaintiff completed a Function Report—Adult in this matter. AR 230–37. Plaintiff reported that she lived in an apartment with family. *Id.* at 230. Plaintiff described her medical conditions as follows:

> My depression and chronic pain interferes w[ith] my ability to work or stay on task. I have [a] hard time concentrating, focusing, or completing basic tasks. My depression keeps me from getting out of the house or bed. I also have a hard time being on my feet for long periods of time.

*Id.* Plaintiff reported that she is able to cook, "indoors arrange," and iron, and that it takes about two (2) hours, weekly or monthly, to perform them. *Id.* at 231. Plaintiff further reported that she needs help to clean, do laundry, vacuum, and mop, and that she cannot do house or yard work when she is down. *Id.*

Plaintiff indicated that she can ride in a car with her son, but cannot go out alone because she feels scared. AR at 231. Plaintiff does not drive, and does not have a car or license. *Id.* Plaintiff reports that she shops in stores with her son for food, clothes, and medicine. *Id.* These tasks take approximately one (1) hour. *Id.* Plaintiff does not report any problems with performing personal care tasks, but that she requires assistance with her medications and reminders to take a shower. *Id.* at 232. Plaintiff reports that she prepares her own meals, which consist of sandwiches and frozen dinners. AR at 232. Plaintiff makes meals such as these almost daily, and it takes her approximately ten (10) minutes. *Id.* Plaintiff further reports that her cooking habits have changed since her conditions began. *Id.*

Plaintiff describes a typical day as waking up, eating breakfast, watching television, talking with her son and daughter, and sometimes knitting. *Id.* at 233. Plaintiff showers, takes medication, and tries to attend her appointments and learn English. *Id.* Plaintiff reports that she also tries to care for her disabled son, who has cancer, by preparing food. AR at 233. Prior to her conditions, Plaintiff reports that she was able to work, but can no longer do so. *Id.* Plaintiff further reports that her conditions affect her sleep, and she is only able to sleep between two (2) and three (3) hours at a time. *Id.*

Plaintiff cannot pay bills, handle a savings account, or use a checkbook, because she cannot read and write in English. *Id.* at 234. Plaintiff described her hobbies as watching television, knitting, visiting with her family, which she tries to do every day. *Id.* Plaintiff noted that she used to run, but can no longer do so. AR at 234. Plaintiff spends time each day, in person, with her son and daughter. *Id.* Plaintiff notes that although she is fine with her family, she is not okay around other people. *Id.* at 235.

Plaintiff further described issues arising from her conditions to include sleep problems, having difficulty climbing stairs, running, societal problems, crying, and nightmares. *Id.* Plaintiff reported that her conditions also affect her ability to walk, hear, climb stairs, see, concentrate, understand English, follow instructions, get along with others, as well as affect her memory. *Id.* Plaintiff further reported that she cannot walk more than one hundred (100) meters, cannot climb more than twelve (12) stairs, and has trouble with her hearing and vision. AR at 235. Plaintiff also stated that she can walk approximately forty (40) meters before needing to rest for approximately ten (10) minutes before resuming her walk. *Id.* Plaintiff noted that she wears glasses for reading. *Id.* at 236. Plaintiff reported that she can pay attention for approximately fifteen (15) minutes, cannot finish what she starts, and cannot follow written instructions, though is better able to follow spoken instructions. *Id.* at 235. Plaintiff also indicated that she does well with authority figures. *Id.* at 236.

On May 18, 2014, Plaintiff completed a Work History Report. AR at 246. Plaintiff listed her jobs prior to the alleged onset of her disability to include working at Target and in hotel housekeeping. *Id.* Plaintiff reported her job at Target entailed bringing boxes into the store from the truck line, opening them, and then shelving the merchandise. *See id.* at 247. Plaintiff further reported that this job did not require the use of machines, tools, or equipment; technical knowledge or skills; and she did not do any writing or complete reports or similar duties. *Id.* Plaintiff also reported that while working for Target she walked for approximately two (2) hours per day and stood for approximately four (4) hours per day. *Id.* Plaintiff reported that she stooped for approximately one (1) hour per day and kneeled or crouched for approximately thirty (30) minutes per day. AR at 247. Plaintiff described the position as requiring her to lift twenty-five (25) pounds frequently, and that this was also the heaviest weight that she lifted. *Id.* She carried merchandise daily. *Id.* Plaintiff reported that she did not have any supervisory responsibilities at Target. *Id.*

Plaintiff described her hotel housekeeping job as requiring her to perform tasks

such as cleaning and changing bed sheets. *Id.* at 248. Plaintiff reported that she used machines, tools, or equipment for this position; did not use technical knowledge or skills; and did not write, complete reports, or perform other similar duties. AR at 248. Plaintiff further reported that the position required her to walk and stand for approximately two (2) hours per day; climb for approximately one (1) hour; and sit, kneel, crouch, and crawl for approximately thirty (30) minutes per day. *Id.* Plaintiff also reported that she lifted and/or carried the vacuum, cart, towels, and sheets for the bed daily. *Id.* Plaintiff indicated that she would frequently lift twenty-five (25) pounds, and the most that she was required to lift was approximately thirty (30) pounds. *Id.* Plaintiff did not have any supervisory responsibilities in this position. *Id*.

Plaintiff supplemented her work history report adding that she had been a fast food worker. *See* AR at 254–56. Plaintiff described her responsibilities as including cooking, cleaning, and helping the staff. *Id.* at 255. Plaintiff reported that she used machines, tools, or equipment; but did not use technical knowledge or skills or write or complete reports in this position. *Id.* Plaintiff further reported that as a fast food worker she walked approximately thirty (30) minutes per day; crawled for approximately one (1) hour per day; and stood for approximately three (3) hours and thirty (30) minutes per day. *Id.* Plaintiff described lifting and carrying kitchenware daily, with the heaviest weight lifted as approximately twenty (20) pounds, and ten (10) pounds or less what she frequently lifted. *Id.* Plaintiff did not supervise other people in this position. *Id.*

Plaintiff completed a Disability Report—Appeal indicating that her mental health had gotten worse, including her depression and PTSD symptoms. AR at 238. As a result, her doctors had increased her medications. *Id.* Plaintiff also noted that her ability to do things like cooking and cleaning decreases as her physical health declines. *Id.* Plaintiff also reported that her memory is "really bad" as a result of her mental health, and it makes things like reading very difficult. *Id.* Plaintiff's counsel completed a second Disability Report—Appeal on her behalf. *Id.* at 257–63. Plaintiff indicated that her heart races, her high blood pressure was worse, and her chest pains had increased.

AR at 257. Plaintiff further reported that she is easily distracted; tired and worried; cries daily; cannot sleep; cannot concentrate; suffers more headaches; and forgets appointments and medications. *Id.*

## 2. Plaintiff's Medical Records

### a. Treatment records

On September 12, 2012, Plaintiff established care with David P. Los, D.O.[3] AR at 439–42. Plaintiff reported running out of lisinopril and glyburide approximately three (3) months prior to the appointment, and that she suffers from depression, anxiety, PTSD, left knee pain, and right arm pain. *Id.* at 439. Dr. Los assessed benign hypertension, Diabetes Mellitus Type II, headache, neurotic depression and PTSD, pain in limb, asthma–unspecified, and chronic left knee pain. *Id.* at 441. Dr. Los noted that Plaintiff should self-refer to behavioral health as needed. *Id.*

On October 1, 2012, Plaintiff followed up with Dr. Los regarding her hypertension.[4] *Id.* at 443–46. Plaintiff complained of knee pain, back pain with radiation and ongoing numbness in her left foot, and right arm pain due to a fall. AR at 443. Dr. Los increased Plaintiff's lisinopril and continued fenofibrate for Plaintiff's hypertriglyceridemia. *Id.* at 445. On October 2, 2012, Plaintiff received an x-ray of her left knee due to pain. AR at 435. Robert W. Burman, M.D. assessed no radiographic abnormality. *Id.* On the same date, Plaintiff also underwent an x-ray of her lumbosacral spine due to low back pain. *Id.* at 436–37. Dr. Burman again assessed no radiographic abnormality. AR at 437. On October 18, 2012, Plaintiff was seen at the University of Arizona Medical Center for severe depression, likely PTSD, insomnia, and dysthymia.[5] *See id.* at 342–56. Plaintiff reported that her husband was assassinated in Iraq, after which her son was diagnosed with osteosarcoma of the right knee joint. *Id.* at 342. The Emergency Department obtained a psychiatry consult, and Plaintiff was prescribed

---

[3] Plaintiff's son and a friend both attended the appointment to translate.

[4] Plaintiff's son and a friend both attended the appointment to translate.

[5] Plaintiff's son brought her to the hospital and assisted with translation.

trazadone. *Id.* at 345–50. Plaintiff was diagnosed with PTSD with evidence of depression; hypercalcemia with hyperproteinemia, likely secondary to hyperparathyroidism, dehydration or paraproteinemia; and a urinary tract infection. *Id.* at 345. On October 19, 2012, Plaintiff was seen by Dr. Los regarding her knee pain. AR at 447–49. Dr. Los assessed patellar tendonitis, prescribed naproxen, and discussed use heat and ice, as well as stretching and strengthening exercises. *Id.* at 448. On October 30, 2012, Plaintiff completed an intake assessment at COPE Community Services. *Id.* at 613.

On November 6, 2012, Plaintiff was seen by Lori Danker, RNP at COPE Community Services for a psychiatric diagnostic interview examination. *Id.* at 614. RNP Danker's diagnostic impressions included major depression, single episode moderate; moderate psychosocial stressors including unemployment, limited social network, and financial stress; and a GAF score of 55. *Id.* On December 17, 2012, Plaintiff was assessed at La Frontera Center reporting symptoms of depression. *See* AR at 290–96. Plaintiff reported seeing her husband killed and son wounded while in Iraq. *Id.* at 290. Plaintiff further reported trouble sleeping due to nightmares, dwelling on past events during the day, being afraid to go outside, an exaggerated startle response, and a fear of crowds and loud noises. *Id.* at 290, 293. Plaintiff was found to meet the DSM criteria for Chronic PTSD, as well as Major Depressive Disorder. *Id.* at 293. Plaintiff's global assessment of functioning ("GAF") score was 45, indicating serious symptoms. *Id.* at 294. On December 21, 2012, Plaintiff was seen at the University of Arizona Medical Center Emergency Room for a toothache.[6] AR at 329–32, 358–73. Plaintiff was noted to have poor dentition with a visible cavity in her right upper rear molar, and her differential diagnosis included a periapical dental abscess, cavity, tooth fracture, and periodontal disease. *Id.* at 365, 367. Plaintiff was given Vicodin and Ibuprofen. *Id.* at 362.

On January 17, 2013, Plaintiff was seen at La Frontera Center by Steven Diez de Pinos, M.D. *Id.* at 303–05. Dr. Diez de Pinos noted that Plaintiff "ha[d] not worked for

---

[6] Plaintiff's son drove her to the hospital and assisted with translation.

some time and had tried to do a bookkeeping trainee program but was unable to do it due to her poor mood, low energy and drive, poor concentration and focus, decreased sense of worth and frequent sleep disturbance with nightmares, flashbacks, increased startle and avoidance of stressors, including other people." *Id.* at 304. Dr. Diez de Pinos further noted that Plaintiff feels fearful around others, sometime hears mumbled voices, and gets no more than one (1) hour of sleep. AR at 304. Plaintiff reported that she had received an antidepressant in the Emergency Room, which she took briefly but discontinued because it caused dizziness. *Id.* Dr. Diez de Pinos prescribed mirtazapine to treat her depression, anxiety and insomnia. *Id.*

On February 15, 2013, Plaintiff was seen at La Frontera Center by Dr. Diez de Pinos. *Id.* at 300–02. Plaintiff reported a decrease in her depression from ten (10) out of ten (10) to seven (7) out of ten on mirtazapine. *Id.* at 301. Plaintiff further reported sleeping three (3) to four (4) hours per night versus one (1) hour and her energy was improved, but she was only eating one (1) meal per day. AR at 301. Dr. Diez de Pinos "strongly suggest[ed] getting in at least 2 [meals]." *Id.* Plaintiff completed an Obsessive Compulsive Disorder ("OCD") questionnaire, scoring a twenty (20); however, Dr. Diez de Pinos posited that all of the things that she checked seemed to be related to trauma issues and related fears. *Id.*

On March 18, 2013, Plaintiff, accompanied by her son, attended a service-planning meeting at COPE Community Services. *Id.* at 694–95. On April 1, 2013, Plaintiff saw Dr. Los for an evaluation of left rib and elbow pain.[7] *Id.* at 315–17, 450–52. Plaintiff reported taking naproxen several months previous, but was not taking it currently. AR at 315, 450. Dr. Los noted Plaintiff's history of hypercalcemia and high triglycerides, and that she reported taking fenofibrate, but had not returned for repeat laboratory work in October. *Id.* Dr. Los assessed left lateral epicondylitis and left costochondritis, prescribing naproxen, as well as rest, ice, and exercises, and noted Plaintiff's very high triglycerides. *Id.* at 316–17, 452. Dr. Los noted that Plaintiff's

---

[7] Plaintiff's son attended the appointment to translate.

hypercalcemia may be contributing to her chronic pain. *Id.* at 316, 452. Dr. Los counseled Plaintiff and her son regarding all issues, including the importance of compliance with laboratory work and follow-ups. *Id.* at 316, 452. On March 6, 2013, Erisha Green, BHT, BA, of COPE Community Services spoke with Plaintiff's son, who explained that his mother missed her appointment because he was recovering from surgery and could not bring her. AR at 619. On March 18, 2013, Plaintiff and her son met with COPE Community Services staff regarding her service and crisis plans. *Id.* at 620.

On April 12, 2013, Plaintiff was seen at La Frontera Center by Dr. Diez de Pinos. *Id.* at 297–99. Plaintiff reported "feeling a little bit better regarding her depression and anxiety but still having more problems with both than she would like and nightmares have re-increased to daily to every other day again." *Id.* at 298. Dr. Diez de Pinos noted that Plaintiffs headaches were "still a significant problem and cause difficulty with concentration, focus and distractibility." *Id.* Dr. Diez de Pinos further noted that she was no long causing herself direct physical harm. AR at 298. Plaintiff showed improved appetite, eating two (2) meals per day, but still only slept for three (3) to four (4) hours per night. *Id.* Dr. Diez de Pinos increased her mirtazapine dosage. *Id.* In addition to her PTSD and major depression, Dr. Diez de Pinos noted her Axis III diagnosis as hypertension, migraine headaches versus multifactorial headaches, and the need to "rule out left-sided neurologic deficit with both motor and sensory components (upper extremity greater than lower extremity) of unclear etiology." *Id.*

On May 30, 2013, staff at COPE Community Services contacted Plaintiff and spoke to her son regarding a missed appointment. *Id.* at 626. The following day, COPE staff again contacted Plaintiff's son to inform him regarding the rescheduled appointment date and time. AR at 627. On June 12, 2013, Plaintiff did not attend her appointment with Dr. Diez de Pinos at La Frontera Center. *Id.* at 306–07. On July 25, 2013, Plaintiff saw Dr. Los for follow-up regarding her throat evaluation.[8] *Id.* at 311–14, 453–55. Dr.

_____

[8] Plaintiff's son also attended the appointment to translate.

Los noted that Plaintiff stopped taking lisinopril because it was causing dizziness. *Id.* at 312, 453. Dr. Los further noted that Plaintiff had not started fenofibrate or called for an endo evaluation of her hyperparathyroidism. *Id.* Dr. Los assessed Plaintiff with hyperparathyroidism, hypertriglyceridemia, and noted that she was stable off lisinopril. AR at 313, 455.

On August 14, 2013, staff from COPE Community Services followed-up regarding a missed appointment. *Id.* at 628. Staff spoke with Plaintiff's son and he stated that he was out, and his mother was at home and receiving services from another provider. *Id.* On August 20, 2013, Plaintiff was seen at COPE Community Services, Inc. by Lori Danker, N.P. for depression.[9] *Id.* at 338–39, 630–32. Plaintiff reported that she had discontinued taking Lexapro because it made her feel dizzy. *Id.* at 338, 630. Nurse Practitioner Danker noted that Plaintiff was sleeping only three (3) hours and unable to return to sleep. AR at 338, 630. NP Danker noted that Plaintiff's depression was worsening, and she prescribed mirtazapine. *Id.* at 338–39, 630–31. NP Danker further noted that Plaintiff's Global Risk Assessment was moderate. *Id.* at 339, 630.

On September 9, 2013, COPE Community Services staff called Plaintiff to follow up regarding her medication. *Id.* at 633. Plaintiff's son reported that she was sleeping and the new medication causes her to sleep too much and to feel dizzy all the time. *Id.* On September 11, 2013, Plaintiff saw Donald Mayes, M.D. at COPE Community Services, Inc. AR at 336–37, 411–12, 634–35. Plaintiff reported feeling tired, sleeping too much, limited energy, and dizziness. *Id.* at 336, 411, 634. Dr. Mayes discontinued Plaintiff's Remeron prescription, and started her on Prozac and Ambien. *Id.* at 337, 412, 635. Dr. Mayes also encouraged Plaintiff to seek talk therapy and follow-up with her primary care physician. *Id.* Dr. Mayes also encouraged Plaintiff to remove any potential weapons from her home, although he listed her Global Risk Assessment as low. *Id.* Plaintiff asked COPE staff if she could schedule her next appointment, instead of being a walk-in, because her son was attending school full time, and she does not have other

---

[9] Plaintiff's son also attended the appointment to translate.

transportation.  AR at 636.

On October 18, 2013, Plaintiff was seen at the University of Arizona Medical Center Emergency Department for a toothache which included facial swelling and headache.[10]  *Id.* at 319–21, 374–86.  Plaintiff was diagnosed with a tooth abscess with mild facial cellulitis.  *Id.* at 320, 377.  Plaintiff was given an intramuscular dose of penicillin G procaine.  *Id.*  Plaintiff had an adverse reaction to the injection and began hyperventilating and became very anxious.  *Id.* at 321, 377–78.  Plaintiff was given a liter of normal saline and the reaction subsided.  AR at 321, 377–78.  This was noted as "a non-anaphylactic reaction secondary to the procaine formulation of the procaine penicillin."  *Id.* at 321, 378.

On November 7, 2013, Plaintiff was seen at COPE Community Services to update treatment planning.[11]  *Id.* at 416–23, 700–02.  Plaintiff's current medications were noted as fluoxetine and zolpidem, which she reported help "a little."  *Id.* at 419.  Plaintiff further reported that she sleeps better, although still has nightmares and flashbacks, but does not have side effects or adverse reactions to her current medications.  *Id.*  Plaintiff's barriers to therapy services were reported as language and a lack of transportation because her son attends school.  AR at 420.  Plaintiff was diagnosed with major depressive disorder.  *Id.*

On February 12, 2014, Plaintiff saw Diana S. Gomez, FNP for a Well Woman Exam.[12]  *Id.* at 388–95, 495–502.  Plaintiff reported taking blood pressure medication, FNP Gomez assumed that it was Lisinopril, the prescription for which had lapsed.  *Id.* at 390, 497.  Plaintiff noted that she feels like her heart beats fast when she goes up stairs, has intermittent chest pain, and goes to her throat.  *Id.*  Plaintiff further reported not taking fenofibrate and had not seen an endocrinologist for hyperparathyroid.  AR at 390, 497.  Plaintiff also reported that she had glucose elevations, but did not take medication

---

[10] Plaintiff's daughter attended the appointment to translate.

[11] Plaintiff's son accompanied her for assistance.

[12] Plaintiff's son attended the appointment to translate.

or check her glucose. *Id.* NP Gomez noted that Plaintiff was "[f]ully able to manage the household[,] [but] [u]nable to do one's own laundry and unable to manage one's own medications." *Id.* at 391, 498. NP Gomez assessed hyperparathyroidism/hypercalcemia, hyperglycemia, hypertension, hyperlipidemia, chest pain/palpations, neck pain, thyromegaly, and a heart murmur. *Id.* at 393, 500. On February 14, 2014, Plaintiff was seen by Mohammad R. Habibzadeh, M.D. for evaluation regarding her chest pain.[13] *Id.* at 406–08, 456–57. Plaintiff reported having exertional, substernal chest pain with radiation to the arm and neck, as well as shortness of breath. AR at 406, 456. Plaintiff further reported the pain was seven (7) out of ten (10). *Id.* Plaintiff had an electrocardiogram in the clinic, which showed "sinus tachycardia with a rate of 107 and no significant ST-T changes." *Id.* at 407, 457. Dr. Habibzadeh noted his concern regarding her symptoms and the possibility of coronary artery disease. *Id.* Plaintiff declined a coronary angiograph, but her son asked regarding any other possible tests that might be available to stratify the risk. *Id.* On February 21, 2014, Plaintiff was seen by Dr. Habibzadeh for a follow-up.[14] AR at 404–05, 458–59, 535. Dr. Habibzadeh noted that at her last visit, Plaintiff complained of seven (7) out of ten (10) exertional chest pain. *Id.* at 404, 458, 535. Dr. Habibzadeh offered a coronary angiography, which Plaintiff refused. *Id.* Plaintiff also refused a nuclear stress test and transthoracic echocardiogram. *Id.* at 404, 458. Dr. Habibzadeh started Plaintiff on metoprolol, aspirin and pravadol. *Id.* On February 26, 2014, Plaintiff underwent bilateral mammograms, which were unremarkable. AR at 396–97, 431–32, 490–91. On the same date, Plaintiff also underwent a thyroid ultrasound and chest x-ray. *Id.* at 398–400, 429–30, 433–34, 492–94. Danielle M. Carroll, M.D. noted a multinodular goiter with no overtly suspicious nodules identified, and a 2.4 cm solid appearing abnormal area posterior and inferior to the right lobe of the thyroid. *Id.* at 398, 434, 492. Dr. Carroll further noted that this latter "may represent a parathyroid adenoma/carcinoma, and further evaluation is

---

[13] Plaintiff's son attended the appointment translate.

[14] Plaintiff's son attended the appointment to translate.

- 14 -

warranted." *Id.* Regarding Plaintiff's chest x-ray, Dr. Carroll noted hypoventilatory changes without acute cardiopulmonary abnormality. *Id.* at 400, 429, 494.

On March 10, 2014, Plaintiff was seen at COPE Community Services to update treatment planning.[15] AR at 413–15, 703–05. On March 14, 2014, Plaintiff saw Dr. Habibzadeh for a follow-up. *Id.* at 460–62, 533–34. Dr. Habibzadeh performed an electrocardiogram which showed sinus tachycardia with no significant ST-T changes. *Id.* at 461, 534. Dr. Habibzadeh noted that Plaintiff could not tolerate a higher dose of metoprolol and that her hypertension was not well controlled. *Id.* Dr. Habibzadeh added isosorbide mononitrate to her medications. *Id.*

On April 14, 2014, Plaintiff saw Dr. Habibzadeh for a follow-up regarding her chest pain. AR at 463–65, 530–32. Plaintiff reported retrosternal chest pressure radiating down her left arm with overexertion. *Id.* at 463, 530. Plaintiff further reported exertional shortness of breath. *Id.* Plaintiff elected to proceed with nuclear stress test. *Id.* at 463–64, 530–31. Dr. Habibzadeh noted that he would optimize her medication. *Id.* at 463, 530. On April 17, 2014, Plaintiff underwent a dual isotope Persantine myocardial perfusion study. AR at 427–28. Christopher P. Gilles, M.D. found no evidence of ischemia, and a normal left ventricular ejection fraction and wall motion study. *Id.* at 427. On April 18, 2014, Plaintiff was seen by Mohammad R. Habibzadeh, M.D. regarding her chest pain. AR at 425–26. Dr. Habibzadeh performed an echocardiogram and found hyperdynamic left ventricular systolic function with an estimated left ventricular ejection fraction greater than 70%; right ventricle not well visualized; trileaflet aortic valve with no regurgitation; trace mitral regurgitation; trace tricuspid and pulmonic regurgitation; Grade 1 diastolic dysfunction; PA systolic pressure could not be estimated due to a lack of tricuspid regurgitant jet; aortic root measured at 2.7 cm; pericardial fat; and no pericardial effusion. *Id.* at 425. Dr. Habibzadeh concluded hyperdynamic left ventricular systolic function with an estimated left ventricular ejection fraction greater than 70%, normal biatrial size, and no significant valvular disease. *Id.*

---

[15] Plaintiff's son accompanied her for assistance.

On April 29, 2014, Plaintiff was seen by Dr. Habibzadeh for a follow-up regarding her echocardiogram.  AR at 401–03, 466–69, 527–29.  Dr. Habibzadeh noted that Plaintiff had undergone "a nuclear stress test which showed no evidence of ischemia." *Id.* at 401, 466, 527.  Dr. Habibzadeh also reported that "[h]er transthoracic echocardiogram showed normal left ventricular systolic function[,] [but] [s]he still has mild exertional/resting chest pain . . . and is in sinus tachycardia." *Id.*  Dr. Habibzadeh's conclusions included "[h]yperdynamic left ventricular systolic function with an estimated left ventricular ejection fraction greater than 70%[,] . . . [n]ormal biatrial size[,] . . . [and] [n]o significant valvular disease." *Id.* at 402, 467, 528.  Dr. Habibzadeh noted Plaintiff's multinodular goiter and parathyroid mass.  *Id.*  Dr. Habibzadeh increased Plaintiff's metoprolol, but noted that her hypertension was well-controlled, and that she was on a statin for her hyperlipidemia.  AR at 403, 468, 528–29.

On May 16, 2014, Plaintiff saw Dr. Habibzadeh for a follow-up regarding her exertional left arm pain associated with shortness of breath.  *Id.* at 524–26.  Dr. Habibzadeh reported that Plaintiff's electrocardiogram performed that day showed sinus tachycardia with a rate of 150.  *Id.* at 524–25.  Dr. Habibzadeh further noted blood work within normal limits regarding D-dimer, TSH, and free T4; however, her triglycerides, total cholesterol, and LDL were elevated.  *Id.*  Dr. Habibzadeh increased her metoprolol for her exertional left arm pain and shortness of breath, but noted that her blood pressure is not well-controlled.  *Id.* at 525–26.

On June 16, 2014, Plaintiff saw Dr. Habibzadeh for a follow-up.  AR at 485–87, 521–23.  Dr. Habibzadeh noted Plaintiff's continuing exertional left arm pain and associated shortness of breath, as well as her sinus tachycardia.  *Id.* at 485–86, 521–22.  Dr. Habibzadeh ordered a Holter monitor for a twenty-four (24) hour evaluation of Plaintiff's heart rate.  *Id.* at 486–87, 522–23.  Dr. Habibzadeh also increased her metoprolol dosage.  *Id.* at 487, 523.  On June 24, 2014, Plaintiff was seen by Talal Moukabary, M.D. regarding her sinus tachycardia.  *Id.* at 482–83, 519–20.  Dr. Moukabary noted that Plaintiff's sinus tachycardia was asymptomatic.  AR at 482, 519.

Dr. Moukabary reviewed Plaintiff's echocardiogram and increased her metoprolol prescription, as her hypertension remained uncontrolled. *Id.* at 483, 520.

On July 8, 2014, Plaintiff saw Dr. Moukabary regarding her sinus tachycardia. *Id.* at 480–81, 517–18. Plaintiff reported occasional chest pain, mostly in the evening, which improved with rest and metoprolol. *Id.* at 480, 517. Dr. Moukabary reviewed Plaintiff's electrocardiogram and increased her metoprolol. *Id.* at 482, 518. On August 19, 2014, Plaintiff saw Dr. Moukabary for a routine visit. AR at 478–79, 515–16. Dr. Moukabary noted that Plaintiff was feeling better with improved blood pressure and heart rate. *Id.* at 478, 515. Plaintiff reported continued dizziness with prolonged standing. *Id.* Dr. Moukabary's examination was unremarkable. *Id.* His assessment included continuing the metoprolol, but discontinuing the isosorbide due to Plaintiff's improved blood pressure. *Id.* at 479, 516.

On September 25, 2014, Plaintiff was seen at COPE Community Services by Claire Damecour, M.D. for her depression. AR at 669–70. Dr. Damecour noted that Plaintiff had not been seen in the clinic for approximately six (6) months. *Id.* at 669. Beginning in January 2014, COPE records reflect missed appointments by Plaintiff, as well as some misunderstandings between Plaintiff and staff regarding appointments. *See id.* at 643–61. During the September appointment, Plaintiff reported that she had not followed up with medications and had not been on them for the past three (3) months; however, reported that she took them for approximately one (1) year and felt improvement. *Id.* at 669. Plaintiff indicated having suicidal thoughts without intent. *Id.* Plaintiff also indicated that she did not want to respond in front of her son, who was acting as the interpreter. *Id.* at 672. Dr. Damecour prescribed fluoxetine and zolpidem. AR at 672. Plaintiff also participated in updating her treatment plan. *Id.* at 706–08.

On October 9, 2014, Plaintiff met with Samar Adi, BHP, LAMFT, MS at COPE Community Services for an individual counseling assessment. *Id.* at 675. Plaintiff expressed a desire to focus on work rather than things that happened in the past. *Id.* On the same date, Plaintiff sought assistance COPE's Lifestyle Improvement Center

("CLIC"). *Id.* at 676. On October 28, 2014, Plaintiff missed an appointment at COPE Community Services. AR at 677.

On November 11, 2014, Plaintiff saw Dr. Moukabary regarding her sinus tachycardia. *Id.* at 513–14. Dr. Moukabary's examination was unremarkable. *Id.* He continued Plaintiff's metoprolol prescription, but discontinued the isosorbide noting that her blood pressure was controlled. *Id.* at 514. On November 12, 2014, COPE Community Services staff reached out to Plaintiff because she missed a November 6, 2014 appointment. *Id.* at 680. On December 9, 2014, COPE Community Services staff called Plaintiff to introduce herself as the new case manager. AR at 681. Staff spoke with Plaintiff's son, who reported Plaintiff was stable on her medication and had sufficient refills. *Id.* On January 27, 2015, COPE Community Services staff called Plaintiff; however, the number was out of service. *Id.* at 683. A lack of contact letter was also returned as "unable to forward." *Id.* at 684.

On April 21, 2015, was seen at the St. Mary's Hospital Emergency Department ("ED") complaining of an itchy rash.[16] *Id.* at 553–55. Christine M. Vicary, M.D. reported that the rash as slightly raised, blotchy, and erythematous, mostly on her arms, as well as her right flank and upper thighs. AR at 554. Dr. Vicary gave Plaintiff Benadryl in the ED, as well as a prescription for home, and a hydrocortisone 2.5% cream prescription. *Id.* On the same date, Plaintiff saw Dr. Los regarding right sided pain for approximately three (3) months and an itchy, hot rash all over her body. *Id.* at 506–08. Dr. Los prescribed Benadryl and a hydrocortisone cream. *Id.* at 506. Dr. Los counsel Plaintiff and her son regarding parathyroid treatment and hyperparathyroidism, as well as treatment for Plaintiff's thyroid mass. *Id.* at 508.

On May 5, 2015, Plaintiff saw Dr. Moukabary regarding her sinus tachycardia. AR at 509–12. Dr. Moukabary noted that Plaintiff's blood pressure and heart rate were improved. *Id.* at 509, 511. Dr. Moukabary's examination was unremarkable, but noted Plaintiff had continuing flank plain and her urology referral was pending. *Id.* at 510, 512.

---

[16] Plaintiff's son was present to assist in translation.

Dr. Moukabary continued Plaintiff's metoprolol prescription. *Id.* On May 10, 2015, Plaintiff was seen in the St. Mary's Hospital Emergency Department complaining of severe right flank pain. *Id.* at 548–52, 587–606. Plaintiff underwent a computed tomography ("CT") scan, which showed a 2 cm stone causing hydronephrosis on the right. AR at 548, 603. Plaintiff also had evidence of a urinary infection. *Id.* at 548, 605. Plaintiff was given IV Rocephin and pain medication in the Emergency Department, and discharged home with pain medication, as well. *Id.* at 548, 551.

On June 18, 2015, Plaintiff was seen at the Banner University Medical Center ("Banner UMC") Urology Clinic for evaluation of nephrolithiasis. *Id.* at 539–41. John Michalak, M.D. noted that Plaintiff had passed one right sided stone approximately three (3) months prior with significant pain, nausea, and vomiting. *Id.* at 539. Plaintiff continues to report right sided flank pain since passing the stone. AR at 539. Dr. Michalak reported that Plaintiff's abdominal x-ray showed a large right renal pelvis stone. *Id.* at 540. Dr. Michalak recommended extracorporeal shock wave lithotripsy ("ESWL") and stent placement based on the size and location of the stone. *Id.* Plaintiff agreed with this plan. *Id.* at 540. On July 29, 2015, Joel T. Funk, M.D. performed the ESWL and stent placement surgery. *Id.* at 561–62.

On October 20, 2015, Plaintiff saw Dr. Los for a follow-up regarding kidney stones. *Id.* at 503–05. Dr. Los noted that Plaintiff was hospitalized in July for kidney stones and underwent surgery for the same. AR at 503. Plaintiff reported that she was trying to see an ear, nose, and throat ("ENT") specialist, as well as an endocrinologist, but cannot find anyone who takes her insurance. *Id.* Plaintiff reports occasional dysphagia. *Id.* Dr. Los noted that her chart indicated a lung nodule, without follow-up. *Id.* Dr. Los's examination was otherwise unremarkable. *Id.* at 504–05. Dr. Los counselled Plaintiff and her son regarding treatment necessity for hyperparathyroidism and thyroid mass, and ordered a CT scan for her lung nodule. AR at 505.

On November 12, 2015, Plaintiff returned for a follow-up at the Banner UMC Urology Clinic regarding her nephrolithiasis. *Id.* at 542–45. Plaintiff has residual stone

fragments on the right side, as well as stent migration.  *Id.* at 542.  Plaintiff underwent a cystoscopy and stent removal, and treatment for the remainder of her kidney stones was to be scheduled for early 2016.  *Id.* at 543–44.

### b.  Examining physicians

#### i.  *Gwendolyn W. Johnson, Ph.D.*

On July 2, 2014, Gwendolyn W. Johnson, Ph.D. examined Plaintiff at the request of the Arizona Department of Economic Security ("AZDES").  AR at 470–74.  Dr. Johnson noted that Plaintiff was accompanied by an interpreter.  *Id.* at 470.  Dr. Johnson reported that Plaintiff stated that she prepare meals, is able to complete household chores, and can drive for appointments, shopping, and errands.  *Id.*  Dr. Johnson further reported that Plaintiff enjoys reading and communicating with her mother and siblings online.  *Id.* Dr. Johnson reviewed Plaintiff's family history including her husband's death and her subsequent immigration to the United States with her two children.  *Id.*  Plaintiff reported that she has two close friends and socializes on occasion.  AR at 470.  Dr. Johnson also reviewed Plaintiff's work history as a kindergarten teacher for twelve (12) years in Iraq, and more recently at Target and in housekeeping.  *Id.* at 471.  Plaintiff reported taking mirtazapine, fluoxetine, and zolpidem.  *Id.*  Dr. Johnson's examination was unremarkable and noted that Plaintiff scored 30/30 on the Mini-Mental State Examination.  *Id.* at 471– 72.  Dr. Johnson reviewed Plaintiff's medical records from three (3) dates.  *Id.* at 472. Dr. Johnson's diagnosis included Anxiety Disorder NOS, noting unemployment, financial stress, and separation from family as psychosocial stressors, and a GAF score of 70.  AR at 472.  Dr. Johnson concluded that Plaintiff "suffer[s] from an anxiety disorder that has likely developed as a result of exposure to trauma and has been aggravated by psycho-social stressors."  *Id.*  Dr. Johnson further found that Plaintiff "d[id] not appear to suffer from any other substantive psychological disorder or condition[,]" concluding that Plaintiff had a good prognosis for a successful return to the work force.  *Id.*  Dr. Johnson completed a medical source statement, and opined that Plaintiff's condition would not limit her for twelve (12) months and that Plaintiff exhibited no evidence of impairment in

understanding and memory; sustained concentration and persistence; social interactions; and adaptation. *Id.* at 473.

### ii. *Scott Krasner, M.D.*

On January 27, 2016, Scott Krasner, M.D. examined Plaintiff at the request of AZDES. AR at 563–76. Dr. Krasner noted that Plaintiff was accompanied by an interpreter. *Id.* at 563. Plaintiff indicated that she was applying for social security due to mental issues, but also has a fast heartbeat when she walks any distance and with standing. *Id.* She further reported being under a cardiologist's care. *Id.* Plaintiff also reported stabbing pains in her fingertips and toes, as well as kidney pain. *Id.* Dr. Krasner listed metoprolol, Keflex/Cipro, naproxen, oxycodone, ondansetron, and phenazopyridine as Plaintiff's current medication. AR at 564. Dr. Krasner's physical examination was unremarkable, and he reviewed only seven (7) appointments of Plaintiff's medical records. *Id.* at 564–65.

On February 1, 2016, Dr. Krasner supplemented his initial memorandum after reviewing an addition seven (7) medical records. Dr. Krasner deferred comment on Plaintiff's psychiatric conditions, and "[f]rom a physical medicine standpoint, . . . noted [Plaintiff] to have essential hypertension[,] . . . some exertional chest pain and tachycardia." *Id.* at 567. Dr. Krasner further noted that Plaintiff "has been evaluated from a cardiologist and does not have any significant problems." *Id.* Dr. Krasner also noted that Plaintiff "does have some mild tenderness in her back with some pain at the extreme range of motion of her back, but there are no other significant findings." *Id.*

Dr. Krasner completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. AR at 568–76. Dr. Krasner opined that Plaintiff could continually lift and carry up to 100 pounds. *Id.* at 568. Dr. Krasner further opined that Plaintiff could sit, stand, and walk for a total of eight (8) hours both without interruption and in an eight (8) hour work day. *Id.* at 569. Dr. Krasner noted that Plaintiff did not require the use of a cane to ambulate. *Id.* Dr. Krasner also opined that Plaintiff could continuously reach, both overhead and otherwise; handle; finger; feel; and

push-pull, with both her right and left hands. *Id.* at 571. Dr. Krasner opined that Plaintiff could continuously operate foot controls with either foot. AR at 571. Dr. Krasner further opined that Plaintiff could continually climb stairs and ramps; climb ladders or scaffolds; balance; stoop; kneel; crouch; and crawl. *Id.* at 572. Dr. Krasner denied any impairments affecting Plaintiff's hearing or vision. *Id.* Regarding environmental imitations, Dr. Krasner opined that Plaintiff could continuously be exposed to unprotected heights; moving mechanical parts; operating a motor vehicle; humidity and wetness; dust, odors, fumes and Pulmonary irritants; extreme cold; extreme heat; and vibrations, and that she could withstand very loud noise. *Id.* at 573. Dr. Krasner opined that Plaintiff was unlimited in the activities she could perform including the ability to shop; travel without a companion; ambulate without using a wheelchair, walker, or two (2) canes or two (2) crutches; walk a block at a reasonable pace on rough or uneven surfaces; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for personal hygiene; and sort, handle, and use paper files. *Id.* at 574.

### iii. Glenn Marks, Ph.D.

On February 1, 2016, Glenn Marks, Ph.D. examined Plaintiff at the request of AZDES. AR at 577–86. This evaluation was completed through the use of an interpreter. *Id.* at 577. La Frontera records from December 17, 2012 through June 12, 2013 and the consultative examination by Gwendolyn Johnson were the only medical records reviewed by Dr. Marks. *Id.* Plaintiff reported feeling overwhelmed and worn-out when asked about her mood. *Id.* Plaintiff further reported that she "never leaves the house by herself and will only go out with either her son or daughter." *Id.* Plaintiff also stated that she is afraid that something bad will happen to one of them, particularly her son, and she is hypervigilant when she goes out with them. AR at 577. Plaintiff reported not feeling that she has any control over her emotions, sleep is very problematic, and she keeps envisioning past traumatic events. *Id.* at 578. Plaintiff further reported that she was a kindergarten teacher in Baghdad, but that she finds language a barrier to working in

the United States. *Id.* Plaintiff described that she does not leave the house without one of her children, and usually her son takes her to the grocery store. *Id.* Occasionally, she will go to an Arabic restaurant with one of her children. *Id.* Plaintiff expressed no interest in making friends, and is not interested in learning English, does not know how to use the internet, and mostly just sits and watches television. AR at 578. Plaintiff suffered a fall, and as a result, her daughter helps her to bathe. *Id*. at 578–79. Dr. Marks noted that it was unclear if Plaintiff ever cooked. *Id.* at 579.

Dr. Marks also noted that Plaintiff's daughter drove her to the evaluation, and while Plaintiff was in the waiting room, waiting for the interpreter, Plaintiff appeared anxious and somewhat tense and her affect constricted. *Id.* Dr. Marks found inconsistencies in Plaintiff's report, but also acknowledged that some issues were cultural differences. *Id.* Dr. Marks did not administer the Mini-Mental State Examination ("MMSE"), "as there [wa]s no evidence of difficulties with memory, focus or concentration." AR at 579. Dr. Marks diagnosed PTSD and insomnia, but found inconsistencies between her current report and previous evaluations. *Id.* at 580. Dr. Marks opined that Plaintiff's "overall presentation suggested a higher level of functioning than she described." *Id.*

Dr. Marks completed a Psychological/Psychiatric Medical Source Statement regarding Plaintiff. *Id.* at 581–86. Dr. Marks confirmed that there was a current psychological diagnosis and that the limitations were expected to last twelve (12) continuous months from the date of examination. *Id.* at 581. Dr. Marks opined that Plaintiff understanding and memory, as well as her sustained concentration and persistence, "[a]ppeared to be sufficient upon examination, with consideration due to language barriers." AR at 581. Regarding social interaction, Dr. Marks noted that Plaintiff described hypervigilance and heightened startle response whenever she leaves, but that she "behaved in a completely socially appropriate manner during this evaluation, and describes going to the grocery store, to a restaurant, and other minimal activities in which she apparently can function reasonably well as long as she has somebody with her

that she trusts." *Id.* Dr. Marks further opined that Plaintiff's ability to adapt to change was "sufficient upon evaluation." *Id.* Dr. Marks also opined that Plaintiff was capable of managing benefit payments. *Id.* Dr. Marks opined that aside from the language barrier, Plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairments. *Id.* at 584. Dr. Marks noted that Plaintiff had mild restriction in her ability to interact appropriately with the public, and no restriction regarding her ability to interact appropriately with supervisors and co-workers or respond appropriately to usual work situations and to changes in a routine work setting. *Id.* at 585. Dr. Marks did not find any other capabilities affected by Plaintiff's impairments. *Id.*

### c. Records produced to the Appeals Council

Robin Ross, M.D., COPE Community Services' Medical Director, provided a Mental Residual Functional Capacity Assessment "RFC" that was submitted to the Appeals Council. AR at 15–17. Dr. Ross indicated that Plaintiff was under he medical care and had been treated at COPE Community Services since 2012. *Id.* at 17. Dr. Roberts noted that her diagnosis included severe PTSD. *Id.* Dr. Ross opined that Plaintiff's estimated degree of impairment regarding her ability to relate to other people, as well as her estimated degree of restriction of daily activities and constriction of interests, were all severe. *Id.* at 15. Dr. Ross further opined that the estimated degree of deterioration in Plaintiff's personal habits was moderate. *Id.* Dr. Ross opined that Plaintiff had moderate limitations on her ability to understand, carry out, and remember instructions; perform simple tasks; perform complex tasks; and perform repetitive tasks in a routine work setting. AR at 15–16. Dr. Ross further opined that Plaintiff had severe limitations on her ability to respond appropriately to supervision, co-workers, and work pressures; perform varied tasks; and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods. *Id.* Dr. Ross reported that she expected these limitations to last for twelve (12) months or longer. *Id.*

## II.     STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.     ANALYSIS

### A.     *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically

determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of September 27, 2013.  AR at 23.  At step two of the sequential evaluation, the ALJ found that "the claimant has the following medically determinable impairments: hypertension, posttraumatic stress disorder (PTSD) and anxiety."  *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 416.921 *et seq.*)."  *Id.*  Accordingly, the ALJ found that "[t]he claimant has not been under a disability, as defined in the Social Security Act, since September 27, 2013, the date the application was filed (20 CFR 416.920(c))."  *Id.* at 29.

Plaintiff asserts that the ALJ erred in finding no severe impairments; by failing to properly assess Plaintiff's symptom testimony, specifically in her failure to inquire into the reasons for Plaintiff's treatment non-compliance; and by failing to articulate any other clear and convincing reasons for discounting Plaintiff's symptom testimony.  *See* Opening Br. (Doc. 16).

### **B.    *Plaintiff's Symptoms***

#### **1. Legal standard**

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective

symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

## 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 24. The ALJ then found "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for

the reasons explained in this decision." *Id.* at 25. The ALJ then found that "the claimant's alleged somatic allegations, the objective medical evidence of record does not corroborate the claimant's alleged symptoms and limitation." *Id.* The ALJ went on to review the medical record and rejected Plaintiff's symptom testimony because 1) Plaintiff was, at times, non-compliant with her treatment; 2) her activities of daily living were "consistent with a significant degree of overall functioning"; 3) she frequently missed appointments; and 4) Plaintiff's medical records show no recommendation by any treating physician suggesting that she be evaluated by a psychiatrist, psychologist or other mental health provider. *Id.* at 25–27, 29.

### a. Treatment noncompliance[17]

The ALJ stated that "Claimant's noncompliance does not support the alleged intensity and duration of pain and subjective complaints." AR at 25. The ALJ pointed to specific records to demonstrate Plaintiff's noncompliance without further analysis. *See id.* SSR 16-3p[18] states, in relevant part:

> We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis of failing to follow prescribed treatment that might improve symptoms] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints[,] . . . [and] [w]e will explain how we considered the individual's reason in our evaluation of the individual's symptoms.

SSR 16-3p, *available at* 2016 WL 1119029 at *8–9 (March 16, 2016). No such inquiry was made in this case, nor was any explanation given to acknowledge that any such evaluation occurred. Indeed, the medical records explicitly state some of the reasons for

---

[17] The Court considers treatment noncompliance to encompass both Plaintiff's failure to pursue certain treatments, as well as missing appointments.

[18] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. §§ 402.35(b)(1) and (2); *Heckler v. Edwards*, 465 U.S. 873 n. 3, 104 S.Ct. 1532, 79 L.Ed.2d 878 (1984).

Plaintiff's noncompliance. *See, e.g.,* AR at 420, 503, 619, 636. As such, Plaintiff's treatment noncompliance was not a legally sufficient reason for discounting her symptom testimony. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); SSR 16-3p, 2016 WL 1119029 at *8–9.

### b. Activities of Daily Living

The ALJ stated that "[t]he claimant acknowledges, in her written statements and oral testimony, that she is able to cook, shop, do laundry, wash dishes, get out and take walks, drive automobile, visit friends/relatives, talk on the phone and requires no assistance in dressing or in personal grooming." AR at 26 (citing Exhibit 4E, Function Rpt.—Adult). This statement is unsupported, if not completely contradicted, by the record.

"[T]he claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[A]n ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]" *Trevizo*, 871 F.3d at 679 (citations omitted). The ALJ's finding that objective medical evidence did not support the alleged severity of the symptoms is inconsistent with Plaintiff's burden.

The ALJ is further reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n.7 (citations omitted); *Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed).

The Ninth Circuit Court of Appeals has "repeatedly warned that ALJs must be

especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why . . . a claimant['s] [symptoms are inconsistent with the evidence in the record] . . . the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).

Plaintiff showed a medically determinable physical impairment that could reasonably be expected to produce the symptoms, and there is no evidence of malingering. The ALJ erred by discounting Plaintiff's symptom testimony on the basis of her daily activities.

### c. Lack of referrals to behavioral health

The ALJ found that "a review of claimant's medical records shows no recommendation by any of her treating physicians that she be evaluated by a psychiatrist, psychologist or other mental health care provider." AR at 27. While this statement may

be true, the medical records also reflect that Plaintiff's treating physicians were aware of her receiving treatment from behavioral health providers. *See, e.g.,* AR at 689–90. The ALJ's finding is legally insufficient to discount Plaintiff's symptom testimony.

### C.      *Additional Treating Source Statement on Appeal*

The Appeals Council declined to consider additional evidence submitted by Plaintiff, because it was dated after the ALJ issued her decision on June 28, 2016. AR at 2. The Appeals Council found "[t]his additional evidence does not relate to the period at issue." *Id.* Dr. Ross's statement indicates that Plaintiff is under her care and has been since 2012. *Id.* at 17. The Court finds that Dr. Ross's the opinion related to the period before the ALJ's decision on June 28, 2016. Thus, it should have been considered. *See* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). "Where the Appeals Council was required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its decision in light of the additional evidence." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011) (citing 20 C.F.R. § 404.970(b)).

### D.      *Step Two Non-Severity Finding*

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The claimant bears the burden to show medical evidence consisting of signs, symptoms, and laboratory findings to establish a medically determinable physical or mental impairment. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005); 20 C.F.R. §§ 404.1512, 404.1520; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless

claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54, 107 S.Ct. 2287, 2297-98, 96 L.Ed.2d 119 (1987)). "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290 (emphasis added)). "[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc)) (alterations in original). Moreover, "[t]he ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).

Here, Plaintiff's medical records document objective medical findings related to Plaintiff's PTSD, depression, anxiety, hypertension, hyperparathyroidism, sinus tachycardia, and diabetes. Thus, unlike *Ukolov v. Barnhart*, the medical records are not devoid of objective evidence of impairment. 420 F.3d 1002 (9th Cir. 2005). "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (citing S.S.R. 85-28). "The ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that [Plaintiff's] claim was 'groundless.'" *Webb*, 433 F.3d at 688 (citing *Smolen*, 80 F.3d at 1290). As such, the ALJ's dismissal at Step Two was in error, and such error was not harmless.

## IV. CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is

REMANDED for further proceedings consistent with this decision, including additional hearing testimony, if necessary.

Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Opening Brief (Doc. 16) is GRANTED;

2)      The Commissioner's decision is REVERSED and REMANDED; and

3)      The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 29th day of March, 2019.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge